IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KHAIRY W. MALEK                    :

                                   :

     v.                            : Civil Action No. DKC 2005-1678

                                   :

MICHAEL O. LEAVITT, SECRETARY,
DEPARTMENT OF HEALTH AND HUMAN:
SERVICES and LINDA M. SPRINGER,
DIRECTOR, OFFICE OF PERSONNEL :
MANAGEMENT

                                   :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment
discrimination case are the motions to dismiss or, in the
alternative, for summary judgment by Defendant Michael O. Leavitt[1],
Secretary of the United States Department of Health and Human
Services ("DHHS") (paper 25) and by Defendant Linda M. Springer,
Director of the United States Office of Personnel Management
("OPM") (paper 26).  The issues are fully briefed and the court now
rules pursuant to Local Rule 105.6, no hearing being deemed
necessary.  For the reasons that follow, the court grants
Defendants' motions.

---

[1] This case was originally brought in 1999 when Donna E.
Shalala was Secretary of DHHS and Janet R. Lachance was Director of
OPM.  Pursuant to Fed.R.Civ.P. 25(d), their successors are
automatically substituted as parties.  The clerk will be directed
to amend the docket accordingly.

I.   **Background**

The following facts are undisputed or viewed in the light most favorable to Plaintiff.[2]  Plaintiff Khairy W. Malek, a male of Egyptian national origin, began working for the DHHS at the Food and Drug Administration ("FDA") in May 1988.[3]  The Agency initially hired Plaintiff as a consultant, but in January 1989 he was appointed as a Senior Staff Fellow/Medical Officer, Center for Drug Evaluation Research, Pilot Drug Evaluation Staff ("PDES"). Although some individuals were hired as permanent Medical Officers, Plaintiff's appointment was temporary, for the period of two years.[4]  In this position, Plaintiff's primary functions were to review applications for new drugs and to make presentations regarding his findings.  Although the position was initially part-time, Plaintiff was converted to full-time in March 1989.  In this capacity, Plaintiff received both a regular salary and a Physician's Compensation Allowance in the amount of $ 9,000.

Although Plaintiff performed well as a Staff Fellow and was promoted to a GS-13, in 1990 the Director of PDES referred him to

---

[2] Plaintiff provides very little background information in the body of the complaint, but instead directs the court to prior Equal Employment Opportunity Commission ("EEOC") decisions, attached to the complaint as exhibit 1.

[3] The court will refer to the DHHS and the FDA collectively as "the Agency" unless otherwise noted.

[4] The Agency states that Plaintiff's appointment was not permanent because of, among other things, his lack of clinical experience. (Paper 2, ex. 1, EEOC decision of Feb. 20, 1997, at 2).

the Deputy Chief of the Advisors and Consultants Staff ("ACS"), to find out about performing work as an Executive Secretary for the FDA's Advisory Committees.  In July 1990, Plaintiff was made acting Executive Secretary for the Arthritis Advisory Committee and, shortly thereafter, became acting Executive Secretary for the Drug Abuse Advisory Committee.  During the period Plaintiff performed Executive Secretary duties, he also was performing Medical Officer duties.

In March 1991, Plaintiff's two-year appointment as a Staff Fellow ended.  Although Plaintiff was not converted to a permanent Medical Officer, the Agency offered him a three-month extension, and then, after that time period had expired, a six-month extension.  The Agency states that the purpose of the extensions was to provide Plaintiff with experience in the Executive Secretary position to determine if he was suitable to be a permanent Executive Secretary.  The Agency sent Plaintiff a letter in August 1991 stating that although it was unable, at that time, to offer him a permanent position as a Medical Officer, the position of Executive Secretary remained a viable option.  During an October 1991 meeting, the Agency reiterated that it still was not ready to place Plaintiff in a permanent Medical Officer position, but asked him whether he wished to continue to pursue the Executive Secretary opportunity.  The Agency told Plaintiff that there was the possibility of extending his appointment an additional three

months, with the hope that he would be offered a permanent Executive Secretary position.

Plaintiff's appointment was extended until March 1992, however on November 29, 1991, the Director of the Center for Drug Evaluation Research sent Plaintiff a memorandum stating that his fellowship would not be extended past March 7, 1992.  In February 1992, Plaintiff applied for the position of Health Science Administrator and for the position of Supervisory Health Science Administrator but the Agency did not hire him for either position.

Although it is not entirely clear when and how Plaintiff's administrative complaint progressed initially, it appears that sometime between August and October 1991, Plaintiff sought Equal Employment Opportunity counseling, (paper 2, ex. 1, EEOC decision of Feb. 20, 1997, at 6), and then formally pursued an administrative claim of discrimination within the Agency. Plaintiff requested an EEO administrative hearing, which was held before an administrative law judge ("ALJ") in 1994. *Id*. at 2.  On May 12, 1995, the ALJ issued a decision recommending a finding of no discrimination.  The Agency issued a final decision on June 30, 1995, in which it adopted the ALJ's recommendation and found that no discrimination had occurred. *Id*.  Plaintiff timely filed an appeal to the EEOC, Office of Federal Operations. *Id*. at 1.

At issue in the appeal was: whether the Agency discriminated against Plaintiff on the basis of national origin and age when it

informed him in August 1991 that he would not be converted to a permanent Medical Officer and when it denied him a Physician's Compensation Allowance as of March 24, 1991; and whether the Agency discriminated against Plaintiff on the basis of national origin and age, and retaliated against him for prior EEO activity, when it informed him that his fellowship would terminate in March 1992, and when it did not hire him for either of the positions to which he applied in February 1992.

On February 20, 1997, the EEOC issued a decision, finding that Plaintiff was discriminated against on the basis of national origin when the Agency failed to convert him to a permanent Medical Officer in August 1991. The EEOC concluded, however, that Plaintiff was not discriminated against on the basis of age. Moreover, the EEOC determined that none of the other actions at issue – the failure to provide Plaintiff with a Physician's Compensation Allowance, the decision to terminate Plaintiff's fellowship in March 1992, and the failure to hire Plaintiff for either of the positions to which he applied in February 1992 – was a result of discrimination.

Following the decision, the Agency filed a motion for reconsideration, which the EEOC denied on September 18, 1997. (Paper 2, ex. 1, EEOC decision of Sept. 18, 1997). The EEOC ordered the Agency to place Plaintiff "into the position of Medical Officer, GM-14, or an equivalent position, retroactive to the date

on which his two-year fellowship expired," and to determine and pay the appropriate amount of back bay and other benefits due.[5]   The decision also provided for attorneys' fees incurred in the processing of the complaint.   *Id.*

After the EEOC denied the Agency's motion for reconsideration, the Agency, by letter, offered Plaintiff the position of Medical Officer in the Center for Drug Evaluation Research's Office of Drug Evaluation IV ("ODE IV").   ODE IV was a successor office to PDES, the office where Plaintiff initially worked as a Staff Fellow.[6] Plaintiff's attorney responded to the offer on November 12, 1997, noting that Plaintiff had concerns with the position offered because it appeared to have some of the same job responsibilities as the Executive Secretary position to which Plaintiff had previously been assigned.   Plaintiff neither accepted nor rejected the job offer.   The Agency then offered Plaintiff another position as a Medical Officer in the Center for Drug Evaluation Research's Office of Compliance, Division of Scientific Investigations, Clinical Investigations Branch ("CIB"), which Plaintiff accepted. Plaintiff was reinstated at the GS-14/1 grade and step, retroactive to 1991.   Plaintiff's placement was made at the minimum grade.   As

_____

[5] The EEOC also ordered the Agency to submit a compliance report and to post a notice of discrimination at the FDA location in Rockville, Maryland.   (Paper 2, ex. 1, EEOC decision of Feb. 20, 1997, at 13).

[6]   PDES ceased to exist on September 29, 1996.

a result of periodic step increases that Plaintiff would have received, Plaintiff's step was increased from GS-14/1 to GS-14/2 retroactive to 1992; from GS-14/2 to GS-14/3 retroactive to 1993; from GS-14/3 to GS-14/4 retroactive to 1994, and from GS-14/4 to GS-14/5 retroactive to 1996.   At the time of his actual reinstatement, in late 1997, Plaintiff was placed at the GS-14/5 grade and step level.

In January 1998, Plaintiff filed a Petition for Enforcement of the September 18, 1997, Order with the EEOC.   Plaintiff alleged that he had not been placed in his former office (PDES), that the position to which he was placed had different duties than the Medical Officer positions in the PDES office and did not involve the evaluation of new drugs, and that, unlike Medical Officers in other areas, there was no prospect for promotion to GS-15 for Medical Officers in CIB.   Moreover, Plaintiff asserted that the grade and step to which he was restored, GS-14/5, failed to comply with the EEOC Order.   Plaintiff claimed that had he not been discriminated against, he would have received a promotion after his appointment to the Medical Officer position, and his grade and step at reinstatement would have been GS-15/10.   As a result of the incorrect placement at the 14/5 level, the Agency's calculation of back pay was too low.   Plaintiff also asserted that the Agency's back pay calculation incorrectly failed to include interest and that although he had provided the Agency with the information it

7

requested pertaining to back pay, the Agency had not awarded him any back pay as of January 1998.  Moreover, Plaintiff maintained that the Agency had not paid him attorneys' fees and costs as required under the September 18, 1997, EEOC Order.  (Paper 25, decl. of Christopher Tulley, ex. 1).  The Agency did not submit any response to the Petition.

On August 13, 1998, the EEOC issued a decision on the January 1998 Petition for Enforcement.  With regard to the Agency's placement of Plaintiff, the EEOC stated that if a Medical Officer position vacancy in PDES existed at the time of the EEOC's September 18, 1997, Order, the Agency should have offered the position to Plaintiff.  The EEOC noted that it was unclear whether such a vacancy existed, and remanded the issue to the Agency for clarification.  *Malek v. Shalala*, EEOC Petition No. 04980013, 1998 WL 546665, at *2 (E.E.O.C. Aug. 13, 1998).  With regard to Plaintiff's grade and step level, the EEOC first stated that "typically, allegations that an individual would have received a promotion subsequent to the discriminatory act are deemed speculative, particularly when the promotion is competitive." *Id*. The EEOC noted however, that GM-15 level promotions at the Agency were not competitive but were based on a peer review process and that any conclusion as to the Agency's compliance with the earlier EEOC Order was contingent upon how the peer review process worked. *Id*. at *3 ("For example, [Plaintiff's] position would have some

merit if it were shown that this process is perfunctory and that all [Medical Officers] are promoted to the GS-15 level within a few years."). The EEOC ordered the Agency to supplement the record with information about the promotion process and to provide an explanation as to why it converted Plaintiff to a GM 14/1 level rather than to a higher level. Finally, the EEOC found that the Agency was in violation of its prior Order because it had not awarded any back pay or attorneys' fees. The EEOC ordered the Agency to pay back pay, with interest, within thirty days of the date the decision became final, and to pay attorneys' fees and costs within ten days of the date the decision became final. *Id*. at *3-4.

On August 17, 1998, Plaintiff filed a supplement to his Petition for Enforcement, maintaining the following: (1) the Agency failed to calculate correctly the earnings on makeup contributions to his Thrift Savings Plan ("TSP"); (2) the Agency improperly allocated his TSP makeup contributions and earnings amongst the possible investment funds; and (3) the Agency failed to reimburse him for approximately $2,800 in conference costs. (Paper 25, decl. of Christopher Tulley, ex. 3). From October 1998 to December 1998, the Agency filed additional information with the EEOC, including information responsive to the EEOC's August 13, 1998, Order, and a report documenting its efforts to comply with the EEOC's September 18, 1997, Order.

On August 19, 1999, the EEOC found that the Agency had complied with its September 18, 1997, Order and denied Plaintiff's petition for enforcement. *Malek v. Shalala*, EEOC Petition No. 04990009, 1999 WL 683643, at *5 (E.E.O.C. Aug. 19, 1999). The EEOC noted that following its August 13, 1998, Order, the Agency paid Plaintiff $640,957.39 in back pay and interest and that the parties had settled the matter of attorneys' fees and costs. With regard to Plaintiff's placement, the EEOC accepted the Agency's explanation that Plaintiff was not offered a position within PDES because PDES was disbanded as of September 26, 1996. *Id*. at 3. Moreover, the EEOC rejected Plaintiff's argument that the Agency violated the Order because it failed to place him in a position that would allow him to evaluate new drugs. The EEOC stated that the initial position the Agency offered Plaintiff was in the "Drug Evaluation" area but Plaintiff refused this position, "despite knowing that PDES no longer existed." Accordingly, the Agency was not required to offer Plaintiff placement into another Medical Officer position. *Id*. With regard to Plaintiff's allegation that he would have been promoted to the GS-15 level, the EEOC found that the peer review promotion process was not perfunctory, that promotions were merit-based, and that there were Medical Officers who did not receive promotions to the GS-15 level. Therefore, Plaintiff's placement at the GS-14 level was appropriate. The EEOC

also concluded that Plaintiff's placement at step level 1 was appropriate.[7]

With regard to Plaintiff's allegations regarding the TSP contributions (alleged in Plaintiff's supplemental Petition for Enforcement), the EEOC concluded that the reimbursed contributions to Plaintiff's TSP account were calculated properly pursuant to 5 C.F.R. § 1605.4(a)(3). The EEOC noted that although there was an issue with the proper allocation of Plaintiff's funds, correspondence from the Agency revealed that it was aware of the problem and was in the process of correcting it. Finally, the EEOC concluded that Plaintiff was not entitled to reimbursement for conference costs because, to the extent that the costs did not constitute lost earnings, they were not encompassed by the regulations pertaining to the relief available through the federal EEO process. The EEOC stated that, if anything, the conference costs were compensatory damages, and, because the discriminatory act occurred prior to November 21, 1991, the effective date of the Civil Rights Act of 1991, Plaintiff was not eligible to receive such damages. *Malek*, 1999 WL 683643, at *4-5.

On September 24, 1999, Plaintiff filed a complaint in the United States District Court for the District of Columbia against Donna E. Shalala, the Secretary of DHHS at that time, and against

---

[7] Title 5, U.S.C. § 5333 states: "New appointments shall be made at the minimum rate of the appropriate grade."

Janet Reno, the Attorney General at that time.  (Paper 1).  On January 27, 2000, Plaintiff filed an amended complaint, which did not include Janet Reno as a defendant, but added as a defendant Janice R. Lachance, the then Director of OPM.  (Paper 2).  On May 19, 2000, after an Order granting Defendants' unopposed motion for an enlargement of time (paper 8), Defendants filed a motion to transfer the case to the United States District Court for the District of Maryland.  The court granted the motion to transfer on March 13, 2001, (paper 16).

Notwithstanding an Order to transfer the case dated March 13, 2001, (paper 17), the case was not transferred until June 20, 2005. The reason for the lengthy delay is not entirely clear.[8] Nevertheless, on November 28, 2005, Defendants Michael O. Leavitt (DHHS) and Linda M. Springer (OPM) filed motions to dismiss or for summary judgment.  (Papers 25 and 26, respectively).

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues

---

[8] Correspondence from the Clerk of the United States District Court for the District of Columbia states that the file was "inadvertently missed for transfer."

"that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of

13

evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

Defendants have moved to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), or alternatively, for summary judgment under Fed.R.Civ.P. 56.  A court considers only the pleadings when deciding a Rule 12(b)(6) motion.  Where the parties present matters outside of the pleadings and the court considers those matters as it does here, the court will treat the motion as one for summary judgment.  *See Gadsby by Gadsby v. Grasmick*, 109 F.3d. 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F.Supp.2d 551, 556 (D.Md. 2003).

## III.  Analysis

### A.  Claims against Michael O. Leavitt/DHHS

In the amended complaint, Plaintiff alleges that DHHS violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 29 C.F.R. § 1614.503.  Plaintiff asserts the following claims: (1) Count I, failure to comply with an EEOC Order with regard to Plaintiff's placement upon reinstatement; (2) Count II, failure to comply with an EEOC Order with regard to TSP Allocations; and (3)

Count IV, failure to comply with an EEOC Order with regard to reimbursement of conference costs.

In the motion for summary judgment, DHHS challenges Plaintiff's claims on the merits, asserting that additional relief was correctly denied.  In addressing the merits, Defendant was too hasty.  As will be explained, Plaintiff's claims are in the nature of an enforcement action and are not properly before this court.[9] To understand this result, a brief background discussion regarding the EEOC's enforcement role is warranted.  The EEOC plays a central role in enforcing its own decisions.   After the EEOC makes a finding of discrimination on the part of a federal agency, unlike in the private sector, it may order the agency to take remedial actions.  *See* 42 U.S.C. § 2000e-16(b).  To the extent that a federal employee believes that the agency is not complying with the EEOC's Order, the employee may file a petition for enforcement with the EEOC.  29 C.F.R. § 1614.503(a).   Once a petition for enforcement is filed, the EEOC, acting through its Office of Federal Operations,  must "take all necessary action to ascertain whether the agency is implementing the decision of the Commission." 29 C.F.R. § 1614.503(b).  The EEOC is authorized to clarify a prior decision, but cannot "change the result" or "enlarge or diminish the relief ordered."  29 C.F.R. § 1614.503(c).  Once the EEOC has

_____

[9] Although DHHS did not fully raise this issue, it did recognize some of the considerations that apply in a footnote to their reply memorandum (paper 37, at 2 n.1).

reviewed the agency's actions, it notifies the employee of its

findings.   The relevant regulation states:

> Where the [EEOC] has determined that an agency is not complying with a prior decision, or where an agency has failed or refused to submit any required report of compliance, the [EEOC] shall notify the complainant of the right to file a civil action for enforcement of the decision pursuant to Title VII, the ADEA, the Equal Pay Act or the Rehabilitation Act and to seek judicial review of the agency's refusal to implement the ordered relief . . . .

29 C.F.R. § 1614.503(g).   Thus, an employee may pursue an

enforcement claim in federal court if the EEOC has made a prior

determination that the agency is not in compliance with the EEOC's

earlier Order or if the agency has failed to file a required

compliance report.[10]

---

[10] There is an alternative route to federal court.  An employee who is not satisfied with the EEOC's resolution of its claim, including the EEOC's ordered remedy, may file a claim in federal district court seeking review of the employee's discrimination claim.  *See* 42 U.S.C. § 2000e-16(c) (providing a right of action if a federal employee is "aggrieved"); 29 C.F.R. § 1614.407(c).  The United States Court of Appeals for the Fourth Circuit has noted: "This right of action is identical to the right of action possessed by a private-sector employee who has received a right-to-sue letter."  *Laber v. Harvey*, 438 F.3d 404, 417 (4th Cir. 2006).  In *Laber*, the Fourth Circuit held that "Title VII does not authorize a federal-sector employee to bring a civil action alleging only that the [EEOC's] remedy was insufficient.  Rather, in order properly to claim entitlement to a more favorable remedial award, the employee must place the employing agency's discrimination at issue."  *Id*. at 423 (footnote omitted).  In so holding, the Fourth Circuit overruled its earlier rulings in *Pecker v. Heckler*, 801 F.2d 709, 423-24 (4th Cir. 1986) and *Morris v. Rice*, 985 F.2d 143 (4th Cir. 1993), which the court stated "stand for the proposition that Title VII authorizes a federal employee to bring a civil (continued...)

In each count that Plaintiff asserts against DHHS, Plaintiff states that the Agency failed to comply with the EEOC's September 18, 1997, Order.  Moreover, at multiple points in the amended complaint, Plaintiff emphasizes that he does not seek a *de novo* review of the EEOC's finding of discrimination.  (Paper 2, at 4, 8).  Instead, Plaintiff requests that the court direct the Agency to comply with the EEOC's September 18, 1997, Order, by taking certain specified actions.  For example, Plaintiff asks that the court direct the Agency to place Plaintiff at the GS 15/10 grade and step as of the date of his reinstatement, with full back pay, and to place Plaintiff in a position with new drug evaluation responsibilities.  In addition, Plaintiff asks that the Agency be required to pay restitution for its improper calculations of Plaintiff's TSP funds and to reimburse Plaintiff for conference costs.  (Paper 2, at 21).

Neither prerequisite for filing an enforcement action in court has been met in this case.  In its August 19, 1999, Order, the EEOC expressly found that the Agency was in compliance with its

---

[10](...continued)
action wherein he challenges only the [EEOC's] remedial award, but does not put his employing agency's underlying discrimination at issue." *Laber*, 438 F.3d at 418.  Plaintiff repeatedly refers to the claims asserted against the Agency as actions *for enforcement* and states that he does not challenge the underlying discrimination.  Accordingly, the court construes the claims against DHHS as actions for enforcement.

17

September 18, 1997, Order.[11]   Moreover, Plaintiff does not allege and there is no evidence that the Agency failed to submit a required compliance report.   Accordingly, pursuant to 29 C.F.R. § 1614.503(g), Plaintiff cannot bring an enforcement action against the Agency, and the motion for summary judgment will be granted with regard to DHHS.   *See Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir. 2003) ("Obviously, if [the plaintiff's] action constituted an enforcement action, the lack of an EEOC determination of non-compliance, which is a prerequisite to such a suit, would have rendered the grant of summary judgment in favor of [the] [d]efendant appropriate on that ground."); *Tsudy v. Potter*, 350 F.Supp.2d 901, 906 (D.N.M. 2004) ("In order for this Court to have jurisdiction over Plaintiff's enforcement action, there must have been an EEOC determination of non-compliance.").   *See also Laber*, 438 F.3d at 417 (recognizing that in *certain circumstances* a plaintiff may seek enforcement of an EEOC order; citing *Timmons*, 314 F.3d at 1232, with approval).

## B.  Claim against Linda M. Springer/OPM

In Count III, Plaintiff alleges that OPM violated 42 U.S.C. § 2000e *et seq.*, 29 C.F.R. § 1614.503(g), and 5 C.F.R. § 890.107,

---

[11] The court notes that in its August 13, 1998, decision, the EEOC did find that the Agency was not in compliance with its earlier Order because it still had not paid Plaintiff any back pay or attorneys' fees.  Following the decision, the Agency paid both back pay, including interest, and attorneys' fees.  Plaintiff does not challenge the failure to pay in this lawsuit.

when it failed to reimburse or to have his health insurance carrier, Blue Cross and Blue Shield ("BCBS"), reimburse him for prescription expenses incurred during his separation from the Agency.[12] OPM asserts that Plaintiff failed to submit the requisite information to support the reimbursement claims at issue, the claims were rightfully denied, and that the court should defer to the OPM's decision and affirm the denial.[13]

To the extent that Plaintiff seeks to enforce compliance with the EEOC's September 18, 1997, Order in this regard, his claim is

---

[12] It appears that Plaintiff's BCBS benefits coverage did not become effective until some time after the date of reinstatement and that Plaintiff also seeks reimbursement for prescription costs incurred after the date of reinstatement but before the effective date of coverage.

[13] OPM also argues that Plaintiff is not entitled to reimbursement because his claim is untimely based on the terms of the insurance contract. Defendant claims that the insurance contract required Plaintiff to assert his benefits claims prior to December 31, 2003, and that, because OPM "only had actual notice of the suit . . . since September 2005," Count III should be dismissed. (Paper 26 at 12). The record shows that Plaintiff filed an amended complaint on January 27, 2000, adding Janet R. Lachance, Director of OPM as a defendant, and asking for payment of the health benefits currently at issue. (Paper 2). A summons was issued for Defendant Lachance on January 28, 2000. Attorney appearances for Defendant Lachance were entered on March 16, 2000, (paper 5) and May 1, 2000 (paper 7), and a joint motion for an extension of time was filed by both Defendants on May 1, 2000 (paper 6). Thus, OPM had notice of the claim and its timeliness argument is unpersuasive.

not proper.[14]   Likewise, to the extent that Plaintiff asserts a separate claim under 5 C.F.R. § 890.107, his claim also fails.

Pursuant to 5 C.F.R. § 890.105(a), a health benefits carrier (e.g., BCBS) resolves claims filed under a federal employee's benefit plan.  If the carrier denies the claim, the employee may ask the carrier to reconsider the denial.  *Id*.  If the carrier continues to deny the benefit, the employee may ask the OPM, the agency tasked with administering the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901-14, to review the claim. Only after both the carrier's claims process and the OPM's review process are completed may the employee seek judicial review of the denied claim.  The regulation states, in relevant part:

> A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim.  A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the carrier or the carrier's subcontractors.  The recovery in such a suit shall be limited to a court order directing OPM to require the carrier to pay the amount of benefits in dispute.

5 C.F.R. § 890.107(c).

The FEHBA grants OPM substantial authority over federal employee health benefit plans.  *Muratore v. U.S. Office of Personnel Mgmt.*, 222 F.3d 918, 920 (11th Cir. 2000).  OPM contracts

---

[14] Plaintiff's opposition memorandum centers exclusively on his entitlement to benefits based on the EEOC Order.  (Paper 32, at 7) ("The EEOC awarded Plaintiff back pay and other benefits.  Back pay and other benefits includes health insurance losses.).

with qualified private insurance carriers to offer health benefits plans, distributes information regarding the available plans to federal employees, promulgates regulations regarding the plans, and interprets the plans to determine the insurer's liability in a particular case. *See* 5 U.S.C. §§ 8901-14; *Muratore*, 222 F.2d at 920. A court reviews OPM's actions under the FEHBA pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, based on the administrative record that was before the OPM when it made its determination.[15] *Burgin v. Office of Personnel Mgmt.*, 120 F.3d 494, 497 (4th Cir. 1997). The APA, 5 U.S.C. § 706, states in relevant part:

> [T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall - . . .
>> (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
>>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

---

[15] The title of OPM's motion to dismiss (paper 26) also indicates that it is "in Opposition to Plaintiff's Motion to Correct the Administrative Record." The docket does not indicate that Plaintiff filed such a motion. However, it appears that Plaintiff attaches exhibits to his amended complaint (e.g., Paper 2, exs. 10, 12), which were not a part of the administrative record before the OPM (paper 26, exs. 1 (submission from Plaintiff), 2 (submission from BCBS), and 3 (benefits plan brochure)) when it made its benefits determination. The court will not consider documents that were not part of the record before the OPM. *See Burgin*, 120 F.3d at 497.

In *Myers v. United States*, 767 F.2d 1072 (4th Cir. 1985), the Fourth Circuit considered the case of a government employee who alleged that the government wrongfully refused to pay his health benefits claim.  The court, in reviewing the OPM's decision, stated: "We are, of course required to defer to an administrative agency's interpretation of its own regulations unless plainly erroneous or inconsistent with the regulation."  *Id.* at 1074 (internal quotation marks omitted).  Similarly, in *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74 (4th Cir. 1993), the Fourth Circuit confirmed that "[b]enefit provisions are rules under the [APA], 5 U.S.C. § 551(4), and this court has previously recognized that fact."  *Caudill*, 999 F.2d at 80 (citing *Myers*, 767 F.2d at 1074).  The court stated: "The standard of review by a court on an administrative agency's interpretation of a rule is whether the decision was arbitrary and capricious.  5 U.S.C. § 706(2)(A).  A district court defers to OPM's interpretation of health benefit contracts unless plainly erroneous or inconsistent with the regulation."  *Caudill*, 999 F.2d at 80 (internal quotation marks omitted).

In a later case, however, the Fourth Circuit appears to have qualified its position in *Caudill* and *Myers*.[16]  *Burgin*, 120 F.3d at 497-98.  In *Burgin*, the court noted that although it was required

----

[16] The Fourth Circuit did not explain how it reconciled *Burgin*, 120 F.3d at 497-98, with its earlier decisions in *Caudill*, 999 F.2d at 80 and *Myers*, 767 F.2d at 1074.

22

to "show substantial deference to an agency's interpretations of its own regulations," it need not defer where the "'administrative interpretation is not based on expertise in the particular field'" but is based on common law principles.  *Id*. at 497 (quoting *Jicarilla Apache Tribe v. Fed. Energy Reg. Comm'n*, 578 F.2d 289, 292-93 (10th Cir. 1978).  The court applied this reasoning to the context of federal health benefits and stated:

> Thus, although we would defer to the agency's determination of whether a health benefits contract meets regulatory requirements, here, the dispute is not to be resolved by reference to the regulatory provisions governing the features of an acceptable contract.  Rather, the essential question is one of the interpretation of the contract's language, a question of law clearly within the competence of the courts, *see Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir. 1984), and which we review *de novo, see* 5 U.S.C. § 706 (the "reviewing court shall decide all relevant questions of law").  With respect to factual matters to which the contract interpretation may be applied, we review only to determine if the agency's determination was arbitrary and capricious, although even this inquiry into the facts is to be "searching and careful." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

*Burgin*, 120 F.3d at 497-98.  *See also Muratore*, 222 F.3d at 922 n.4 (noting that, although application of the arbitrary and capricious standard to OPM health benefits determinations is the majority rule, that "[t]he Fourth Circuit appears to have authority pointing in both directions," and citing the Fourth Circuit's application of

23

the arbitrary and capricious standard of review in *Caudill* and its use of the *de novo* review standard in *Burgin*).[17]

This court need not resolve any conflict that may exist between *Caudill* and *Myers* on one hand, and *Burgin* on the other. Here, unlike in *Burgin*, the controversy does not center on an interpretation of disputed contract provisions.[18] *See Campbell v. U.S. Office of Personnel Mgmt.*, 384 F.Supp.2d 951, 955 (W.D.Va. 2004) (distinguishing *Burgin* because the essential question was "not one of contract interpretation in which the meaning of a term in a Plan is disputed, but one regarding a judgment of medical necessity," and finding that its review should be deferential). Instead, the issue is whether Plaintiff followed the plan's procedures and supplied the requisite information for BCBS to reimburse him for his expenses (i.e., it is a factual dispute). Accordingly, the court reviews OPM's actions to determine if they were arbitrary and capricious.

The plan brochure states: "A copy of the explanation of benefits (EOB) from any primary payer (such as Medicare) must be

---

[17] Despite its assertion that a *de novo* standard of review was proper, in *Burgin* the Fourth Circuit concluded that the OPM's interpretation of the contract "was not a reasonable one" and that the OPM decision denying coverage was "arbitrary" and "constitute[d] an abuse of discretion." *Burgin*, 120 F.3d at 499.

[18] Plaintiff does not dispute that the arbitrary and capricious standard applies. In the amended complaint, Plaintiff asserts that OPM's denial of benefits was arbitrary and capricious. (Paper 2, at 20).

sent with your claim." (Paper 26, ex. 3, at 36).  The plan also provides:

> Within 30 days after receipt of your request
> for reconsideration, the Carrier must affirm
> the denial in writing to you, pay the claim,
> or request additional information that is
> reasonably necessary to make a determination.
> If the Carrier asks a provider for information
> it will send you a copy of this request at the
> same time.   The Carrier has 30 days after
> receiving  the  information  to  give  its
> decision.  If this information is not supplied
> within 60 days, the Carrier will base its
> decision on the information at hand.

*Id.* at 38.

On January 28, 1998, Plaintiff sent a letter to BCBS listing medical expenses and asking for reimbursement for the cost of drugs he paid "after subtracting the usual $12 for each prescription." (Paper 26, ex. 1).  The $12 deduction appears to correspond with the out-of-pocket cost that Plaintiff would have incurred had he been covered under the BCBS plan and ordered his prescriptions through the mail.  (Paper 26, ex. 3, at 33).  Plaintiff stated that during his separation, he was insured by the American Medical Association ("AMA") Insurance Agency.[19]  Plaintiff claimed that the AMA paid fifty percent of his drug costs after deducting $250 each year.  Attached to this letter was documentation from the AMA and some receipts from the drug purchases.  Plaintiff stated in the letter that the AMA had no records for him prior to 1995 and that

---

[19]  In a January 14, 1999, letter, Plaintiff explains that during his separation from the Agency, Medicare was his primary insurer and the AMA was his secondary insurer.

he was unable to locate all receipts to substantiate his purchase claims. *Id*.

Plaintiff sent a follow-up letter to BCBS on April 3, 1998, again asking for repayment, and enclosing additional AMA documentation.   Plaintiff sent a third letter in August 1998.   In the August 1998 letter, Plaintiff acknowledged that he had received some payment from BCBS but was seeking reimbursement for the amounts remaining unpaid.   Included with the letter was additional documentation which, based on Plaintiff's explanation in the letter, was a printout from Rodman's Pharmacy listing drug purchases from 1995-1998.   Plaintiff stated: "The majority of the drugs, but not all, were purchased from Rodman's." (Paper 26, ex. 1).   Plaintiff also enclosed a "record of drugs paid for from August 1997 to March 1998."   In a letter dated October 2, 1998, BCBS notified Plaintiff that it needed additional documentation from him.[20]

---

[20] Although Plaintiff attaches this letter to his amended complaint, (paper 2, ex. 12), based on OPM's submission of the administrative record (paper 26, exs. 1,2, and 3), the letter does not appear to have been a part of the record before the OPM. However, a December 11, 1998, letter from BCBS to Plaintiff (that is part of the administrative record (paper 26, ex. 2)) quotes the October 2, 1998, letter as stating the following:

> [D]ocumentation should detail the dates of service, the prescription number, the drug name, the amount of the drug, the deductible or copal amount you paid, and the amount paid by the other carrier.   In addition, we are requesting a letter of confirmation, from
> (continued...)

On December 11, 1998, BCBS sent a letter informing Plaintiff that, because he had not provided the information it had requested, within sixty days of the October 2, 1998, letter, it would base its decision for payment on the information originally submitted. (Paper 26, ex. 2).  Based on this information, BCBS concluded that it was "unable to provide additional reimbursement for [Plaintiff's] claims.

On January 14, 1999, Plaintiff sent a letter to OPM to appeal BCBS's denial of reimbursement for medical expenses.  On February 8, 1999, BCBS issued an "Explanation of Denial Report," which explained its reasons for denying Plaintiff's claims.  The report stated:

> [Plaintiff] did not provide Explanation of Benefits (EOB's) that corresponded to the receipts he filed. [Plaintiff] provided receipts from Rodman's pharmacy dated 1994 through 1998.  The EOB he provided includes a small portion of these receipts from 1997 and 1998 from Rodman's Pharmacy, as well as various other pharmacies, including Cts and Yore Recall Drug.  No receipts from these pharmacies are included, nor are EOB's from years prior to 1997. [Plaintiff] indicated in his letter to [BCBS] that he had other insurance coverage for the entire time period (1994 through 1998).  Without receipts, claims cannot be accurately processed.  Without EOB's from another carrier, it is possible that [BCBS] would inadvertently overpay [Plaintiff].

---

[20](...continued)
        Medicare or the service provider, stating that those claims are the only ones for which they provided benefits.

(Paper 26, ex. 2).

After reviewing the documentation submitted by BCBS and by Plaintiff, along with the insurance plan brochure, the OPM concluded that BCBS was correct in denying Plaintiff reimbursement for the prescription expenses at issue. (Paper 2, ex. 17). The OPM stated that BCBS had requested additional documentation on October 2, 1998, and that Plaintiff failed to provide the information within sixty days after the carrier requested it, or before the timely filing period had ended. Accordingly, BCBS had to base its decision on the information it had, which was insufficient to make an accurate determination of benefits. The OPM concluded: "Unfortunately, we must concur with the Plan to deny additional benefits based on timeliness and insufficient information."

OPM's decision to approve the benefits denial was not arbitrary and capricious. OPM reviewed submissions from both Plaintiff and BCBS, along with the benefit plan brochure. The terms of the plan required Plaintiff to submit additional information reasonably necessary to determine the appropriate reimbursement, within 60 days of BCBS's request for such information. (Paper 2, ex. 3, at 38). BCBS found that Plaintiff did not provide such additional information and that, based on Plaintiff's initial submissions, his documentation was insufficient to process his claims accurately. Based on its own review, the OPM

agreed with this conclusion.   Insofar as the court can determine, the administrative record supports this finding.  *See Caudill*, 999 F.2d at 80 (finding that the OPM did not act arbitrarily and capriciously where there was "nothing to suggest that OPM's interpretation of the contract at issue . . . was irrational"); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 646 F.2d 125, 127 (4th Cir. 1981) (noting that an agency action must not be set aside as arbitrary and capricious if the action has a rational basis in the administrative record).   Moreover, Plaintiff, in his opposition memorandum, does not dispute the evidence in the administrative record, or suggest that OPM failed to consider relevant information in its determination.   Instead, Plaintiff relies wholly on his assertion that the EEOC ordered "make-whole" relief that OPM denied him when it failed to reimburse him for the prescription costs he incurred during his separation from the Agency.   As this court noted, any claim for enforcement of the EEOC Order is not properly before this court.   Accordingly, a grant of summary judgment to OPM is warranted.

## IV.  Conclusion

    For the foregoing reasons, the court will grant Defendants' motions for summary judgment.   A separate Order will follow.


                            _____/s/_____
                            DEBORAH K. CHASANOW
                            United States District Judge